**O**

# United States District Court
# Central District of California

| | |
|---|---|
| KAWASKI CORLEY, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>FEDEX GROUND PACKAGE SYSTEM INC.,<br><br>Defendant. | Case № 5:19-cv-00429-ODW (SHKx)<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR CLASS CERTIFICATION [69]** |

## I.    INTRODUCTION

Plaintiff Kawaski Corley was a linehaul driver for Defendant FedEx Ground Package System, Inc. ("FedEx").  He brings suit against FedEx asserting that he and other linehaul drivers were employees under California law and that FedEx failed to hire them as such.  Corley now moves for class certification.  (Mot. Class Certification ("Motion" or "Mot."), ECF No. 69.)  After carefully considering the papers filed in connection with the Motion, the Court deemed the matter appropriate for decision without oral argument.  Fed. R. Civ. P. 78(b); L.R. 7-15.  For the following reasons, the Court **DENIES** Corley's Motion.

## II.   BACKGROUND

FedEx is a licensed motor carrier that provides package transportation and delivery services throughout the United States.  (Decl. Brian Tangi ("Tangi Decl.") ¶ 3, ECF No. 70-7.)  FedEx maintains approximately eight hubs and fifty stations within California, and during the relevant time period it contracted with around 340 California-based linehaul Transportation Service Providers ("Service Providers" or "Providers") to move goods between these hubs and stations prior to the goods reaching their end destination.  (Mot. 1; Opp'n 2, ECF No. 70.)

From approximately 2008 to 2017, Corley, and then his company, were Transportation Service Providers for FedEx.  (Decl. Jessica Scott ("Scott Decl.") Ex. 8 (Dep. Kawaski Corley ("Corley Dep.")) 138:10-12, 165:5-9, 170:24–172:11, ECF No. 70-8.)  The relationship between Corley and FedEx was governed by a Linehaul Contractor Operating Agreement ("Operating Agreement").  (Tangi Decl. ¶¶ 21–22.)  On May 3, 2011, the Parties entered into an amended Operating Agreement under which K Corley Trucking Inc. ("K Corley") was substituted in as the contracting entity.  (*Id.*)  At first, Corley was K Corley's sole employee, but the business eventually grew to four employees.  (Corley Dep. 26:19-25, 178:13-15, 226:21-25.)  For most of the class period, Corley's main role with K Corley was to manage and oversee its employee-drivers, and Corley himself would drive only if a K Corley employee did not arrive for their shift.  (*Id.* at 120:22–121:9, 182:11-15, 297:4-25, 315:24–316:15, 388:20–389:5.)

FedEx establishes relationships with only those Service Providers that have incorporated, including when the Service Provider corporation would consist of just a single owner-manager-driver.  (*See* Decl. Cody R. Kennedy ("Kennedy Decl.") Exs. 5–9 ("Operating Agreements"), ECF Nos. 54-3 to 54-7.)  Each Service Provider owns or leases its own tractors, and many Service Providers contract simultaneously with other firms, such as Amazon, to provide transportation services.  (Scott Decl. Ex. 9 (Dep. Brian Tangi ("Tangi Dep.")) 35:1-6, ECF No. 70-8; Tangi Decl. ¶¶ 4–6, 19–20.)

The typical Service Provider has between ten and fifteen employees and seven trucks. (Tangi Dep. 122:13-20)   The smallest Service Providers consist of a single owner-operator, and the largest have a couple hundred employees and millions of dollars in annual revenue.   (*Id.* at 122:13–123:5.)   Service Providers hire their own employees and decide their pay.   (Corley Dep. 189:3-11; Scott Decl. Ex. 1 ("Decl. Michael Cahill") ¶ 9, ECF No. 70-8; Scott Decl. Ex. 12 ("Dep. Kristen Mikan") 9:16–12:2, ECF No. 70-8.)   Service Providers manage their own employees, and the Service Provider, not FedEx, is responsible for ensuring compliance with federal, state, and local labor laws.   (Tangi Decl. Ex. B ("TSPA") § 6.2.)

FedEx pays Service Providers "settlement" for services, and from that revenue, Service Providers pay their expenses and employees and generate profits for their owners.   (*Id.* at Schedule C; Corley Dep. 178:13–179:6; Scott Decl. Ex. 11 ("Dep. Michael W. Grodi") 105:6–108:18, ECF No. 70-8.)   Service Providers can and do sell their assets and contracts to other companies.   For example, during the class period, Corley's company sold two unassigned transportation runs for $110,000.   (Corley Dep. 341:10-342:8.)

FedEx subjects its Transportation Service Providers to various rules and requirements as part of their contractual relationship.   (*See* Mot. 3–5.)   One such rule is that the Provider designate an "Authorized Officer" and a "Business Contact" to be the primary points of contact between the Provider and FedEx.   (*See, e.g.*, Kennedy Decl. Ex. 5 at 71.)   Corley likens the role Authorized Officers and Business Contacts serve to that of a FedEx middle manager.   (Mot. 5.)   Authorized Officers usually own the Service Provider and might drive a truck themselves, direct operations, hire additional drivers, and delegate management.   (*See* Kennedy Decl. Ex. 4 ("Pl. Tangi Dep.") 9:17-50:20, 98:13-99:8, ECF No. 54-2; Opp'n 3.)   FedEx's contractual expectations and requirements for its Service Providers include expectations and requirements regarding the behavior and work habits of the entire corporation, including the Service Provider's employees.   (*See* Mot. 2–6.)

Since 2017, Corley and K Corley have had no relationship with FedEx Ground. (Corley Dep. 138:10-12, 340:24–343:16.)

On January 9, 2019, Corley brought suit in the Superior Court of California, County of San Bernardino, asserting claims for: (1) declaratory relief; (2) failure to pay minimum wages; (3) failure to pay overtime wages; (4) failure to provide meal breaks; (5) failure to provide rest breaks; (6) failure to reimburse for necessary business expenses; (7) failure to provide adequate wage statements; (8) unlawful deductions from wages; (9) unfair competition; and (10) quantum meruit/unjust enrichment. (Notice of Removal ("NOR") Ex. A ("Compl."), ECF No. 1-1.)  On March 8, 2019, FedEx removed the case to this Court based on diversity jurisdiction, 28 U.S.C. § 1332(a), and on jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d).  (NOR ¶¶ 8–34.)

FedEx moved for and obtained partial summary judgment in the form of a series of rulings on the applicable limitations period for each of Corley's claims. (Order 8.)  Following the Court's ruling on FedEx's motion for summary judgment, Corley filed the operative First Amended Class Action Complaint.  (First Am. Compl. ("FAC"), ECF No. 39.)

Corley now moves for class certification.  He seeks certification of the "Class," which he now defines as:

> All persons who at any time during the Class Period, and within the State of California: (1) directly performed, or were designated as an authorized officer/business contact responsible for the performance of, the "linehaul" transportation of goods for Defendant pursuant to a Linehaul Transportation Service Provider Agreement ("TSPA"), or similarly titled agreement; and (2) were not designated by Defendant as its employees.

(Mot. ii.)  He also seeks certification of "Subclass A," which he defines as "All persons falling within the Class Definition who were designated as 'Authorized Officers' pursuant to a TSPA . . . during the Class Period."  (*Id.*)  Corley indicates that

these definitions are intended to supersede the class definitions in the First Amended Class Action Complaint.  (*Id.*)

Corley seeks class certification on four claims in particular: (1) his declaratory relief claim for misclassification, on behalf of the entire Class; (2) his claim for reimbursement of business expenses/unlawful deduction of wages, on behalf of Subclass A; (3) his claim for failure to provide accurate itemized wage statements, on behalf of the Class; and (4) his claim for unfair business practices, on behalf of the Class.  Corley does not seek class certification for any of the other claims in his First Amended Class Action Complaint.  (Mot. iii.)  Thus, based on the Court's rulings in its Order on FedEx's Motion for Summary Judgment, the applicable limitations period for the first three claims at issue began January 9, 2016, and ended January 9, 2019.  (Order 8; NOR ¶ 1.)   The limitations period for the fourth claim at issue began January 9, 2015, and ended January 9, 2019.  (Order 8; NOR ¶ 1.)

The parties briefed the Motion, and on November 30, 2021, the Court took the matter under submission.  (Opp'n; Reply, ECF No. 72.)  More recently, the Court ordered supplemental briefing on the retroactivity of the ABC Test for employment classification, and the parties filed briefs and responses in accordance with the Court's order.  (Mins., ECF No. 81; Def. Suppl. Br., ECF No. 82; Pl. Suppl. Br., ECF No. 84; Pl. Suppl. Resp., ECF No. 85; Def. Suppl. Resp., ECF No. 87.)

### III.   LEGAL STANDARD

Class certification is appropriate only if the parties demonstrate each of the four requirements of Rule 23(a) and at least one of the requirements of Rule 23(b).  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613–14, 621 (1997).   Under Rule 23(a), a class action is certifiable only if (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a).

As for Rule 23(b), Corley relies solely on Rule 23(b)(3), which states that a class may be maintained where "questions of law or fact common to class members predominate over any questions affecting only individual members," and a class action would be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

"Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Rather, "[a] party seeking class certification must affirmatively demonstrate . . . compliance with the Rule," *id.*, by a preponderance of the evidence, *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir. 2022). If faced with conflicting or insufficient evidence on the issue of class certification, the Court must "judge the persuasiveness and not merely the admissibility of evidence bearing on class certification." *Henson v. Fid. Nat. Fin. Inc.*, 300 F.R.D. 413, 417 (C.D. Cal. 2014) (citing *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011)). This "may 'entail some overlap with the merits of the plaintiff's underlying claim.'" *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 465–66 (2013) (quoting *Dukes*, 564 U.S. at 351).

"[A] court's class-certification analysis must be 'rigorous' . . . ." *Id.* at 465. This is true of analysis under Rules 23(a) and 23(b) alike. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). If the court concludes that the moving party has met its burden of proof, then the court has broad discretion to certify the class within the framework of Rule 23. *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001).

## IV.   DISCUSSION

The Court declines to certify a class for purposes of declaratory relief because Corley no longer has a business relationship with FedEx and therefore lacks standing to pursue prospective relief on behalf of a putative employee class. The Court declines to certify Subclass A for purposes of the business expense reimbursement because even if one of the applicable employment classification tests can be applied

classwide, individualized inquiries would nevertheless predominate damages calculations across Subclass A; moreover, typicality is not satisfied. Next, the Court declines to certify the class for the purpose of the wage statement claim because the test that applies to the strong majority of class members is not capable of classwide application. Finally, the unfair competition claim is derivative and is therefore also uncertifiable.

## A.   DECLARATORY RELIEF; STANDING

Corley seeks to certify a class for the purposes of his first claim for declaratory relief. According to the Notice of Motion, Corley's claim for declaratory relief is brought under California law and specifically under California Code of Civil Procedure section 1060. Corley seeks a declaration that (1) "Defendant's conduct violated and violates California law;" (2) "Plaintiff and the class members are Defendants' employees and entitled to the protections of the Labor Code and applicable Wage Order;" and (3) Defendant must pay "restitution and disgorgement of all sums improperly retained by Defendant[] as a result of [its] misclassification of Plaintiff and class members." (FAC Prayer for Relief ¶ 4.)

The "California law" Corley alleges FedEx violated includes Wage Order 9 of the California Industrial Welfare Commission ("IWC")[1] and California Labor Code section 3357, which provides that "[a]ny person rendering service for another, other than as an independent contractor, or unless expressly excluded herein, is presumed to

---

[1] The IWC was created pursuant to a California constitutional amendment granting legislative, executive, and judicial powers to an independent body whose initial purpose was to regulate wages and conditions of employment for women and children in the workforce. *Martinez v. Combs*, 49 Cal. 4th 35, 53–54 n.20 (2010). To effectuate this purpose, the IWC issued Wage Orders setting minimum wages and work conditions in a variety of industries. *Id.* at 54. Thus, "[i]n California, wage orders are constitutionally-authorized, quasi-legislative regulations that have the force of law." *Dynamex Operations W. v. Superior Court*, 4 Cal. 5th 903, 914 n.3 (2018). The IWC was defunded in 2004, but seventeen of its wage orders remain in effect and apply to all California employees. *Id.* at 936 n.14. The standards and requirements in a Wage Order apply whenever someone "employs" another in the relevant field, with the word "employ" expressly defined in each Wage Order. *See Martinez*, 49 Cal. 4th at 57–60.

be an employee."   The statutory presumption section 3357 provides is limited to the context of workers' compensation claims, but it embodies the general presumption of employment that arises under California law when a person performs work or labor for another, *Dynamex Operations W. v. Superior Court*, 4 Cal. 5th 903, 955–56 (2018).

"[D]eclaratory relief 'operates prospectively to declare future rights, rather than to redress past wrongs.'" *Pub. Serv. Mut. Ins. Co. v. Liberty Surplus Ins. Corp.*, 51 F. Supp. 3d 937, 950 (E.D. Cal. 2014) (quoting *Canova v. Trs. of Imperial Irrigation Dist. Emp. Pension Plan*, 150 Cal. App. 4th 1487, 1497 (2007)); *see Travers v. Louden*, 254 Cal. App. 2d 926, 931 (1967) (explaining that purpose of declaratory relief action is "to set controversies at rest before they lead to repudiation of obligations, invasions of rights, or commissions of wrongs").  Thus, "declaratory relief will not be provided where only past alleged wrongs are at issue." *Osseous Techs. of Am., Inc. v. DiscoveryOrtho Partners LLC*, 191 Cal. App. 4th 357, 375 n.6 (2010).  Accordingly, Corley's first claim places at issue only whether he and the class are entitled to a declaration that, in the present and moving forward, FedEx's relationships with its Service Providers, if unchanged, violate California employment law.

FedEx argues that Corley lacks standing to pursue this declaratory relief, and FedEx's argument is well taken.  The "'irreducible constitutional minimum' of Article III standing consists of three elements." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* at 560–61; *Ctr. for Biological Diversity v. Mattis*, 868 F.3d 803, 816 (9th Cir. 2017).

Examining the standing requirement in this case, Corley's "allegations of past injury alone are not sufficient to confer standing" to pursue a declaratory judgment.

*Leu v. Int'l Boundary Comm'n*, 605 F.3d 693, 694 (9th Cir. 2010) (citing *Fieger v. Mich. Supreme Court*, 553 F.3d 955, 962 (6th Cir. 2009); *see also Bayer*, 861 F.3d at 861–62, 868 (confirming no standing to pursue declaratory relief when "parties have no relationship beyond this litigation" and plaintiff "produced no evidence to show the conduct complained of in this action presently affects him or can reasonably be expected to affect him in the future").  A declaration that FedEx's current and future conduct violates California law would not have any effect on Corley, as Corley no longer works for FedEx and does not express any intent to do so in the future.  In short, Corley cannot show that putative class members' classification "continues to affect [his] present interest,'" *Bayer*, 861 F.3d at 868 (quoting *Super Tire Eng'g Co. v. McCorkle*, 416 U.S. 115, 125–26 (1974)), so he lacks standing for declaratory judgment.

A plaintiff must have standing to assert class claims, and district courts may properly deny class certification when a named plaintiff lacks standing.  *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 40 n.20 (1976) ("[N]amed plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'" (quoting *Warth v. Seldin*, 422 U.S. 490, 502 (1975))); *see, e.g., Jang v. Asset Campus Hous., Inc.*, No. CV 15-01927-BRO (PJWx), 2016 WL 11755105, at *4 (C.D. Cal. May 4, 2016) (refusing to reconsider denial of class certification based on named plaintiff's lack of standing to pursue injunctive or declaratory relief); *see also Dukes*, 564 U.S. at 364–65; *cf. Cholakyan v. Mercedes-Benz, USA, LLC*, 281 F.R.D. 534, 559 (C.D. Cal. 2012) (noting that putative class members who were former owners of class vehicles would gain "no tangible benefit" from declaratory relief).

Here, as discussed, Corley lacks standing to pursue the declaratory relief he seeks, and he is the only named Plaintiff in the action.  Certification of the declaratory relief claim is denied on this basis.  Corley's Motion is **DENIED** to this extent.

**B.    REIMBURSEMENT OF BUSINESS EXPENSES**

Corley next presents for certification his claim for failure to reimburse business expenses.  Corley brings this claim pursuant to California Labor Code section 2802, which requires employers to indemnify their employees "for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties."  Cal. Lab. Code § 2802(a).  The purpose of the statute is "'to prevent employers from passing their operating expenses on to their employees.'"  *Cochran v. Schwan's Home Serv., Inc.*, 228 Cal. App. 4th 1137, 1144 (2014) (quoting *Gattuso v. Harte-Hanks Shoppers, Inc.*, 42 Cal. 4th 554, 562 (2007)).  Corley also brings the claim under IWC Wage Order 9, section 9, which provides that "[w]hen tools or equipment are required by the employer or are necessary to the performance of a job, such tools and equipment shall be provided and maintained by the employer."  Cal. Code Regs. Tit. 8, § 11090.  The gravamen of Corley's claim is that FedEx "failed to reimburse Plaintiff and Class Members for all business-related expenses and costs delivery workers incurred including, but not limited to, fuel, maintenance, repairs, uniform costs and expenses, scanner fees, cell phone fees, GPS service fees, and liability and other insurance covering work place injuries or property damage."  (FAC ¶ 67.)  Instead, each Transportation Service Provider was responsible for paying these expenses itself.

The central legal question raised by this claim is whether the members of Subclass A—the Authorized Officers of California Transportation Service Providers—were employees in the first place.  If they were not, then they were not entitled to reimbursement of business expenses; if they were, then the expenses may be (but are not necessarily) reimbursable.  To determine whether this question is capable of classwide resolution, the Court must first establish which analytical framework governs the employment classification question.  In other words: what test governs whether California law required FedEx to classify members of Subclass A as employees?  Due to recent developments in California employment law, including

*Dynamex Operations W. v. Superior Court*, 4 Cal. 5th 903, which issued in 2018, and Assembly Bill 5, which codified *Dynamex*'s test for employment status as of January 1, 2020, the answer to this question is not straightforward.

As explained below, Corley's business expenses claim arises from two different parts of California labor law and accordingly invokes two different employment tests: the ABC Test and the *Borello* test. The *Borello* test is not capable of classwide application at all, and even if the ABC Test is capable of classwide application, Corley fails to articulate a plausible method for both determining and calculating damages on this claim that would not involve a detailed individualized inquiry. Moreover, his claims are not typical of those of Subclass A.

    *1.*    *Both the* Borello *test and the ABC Test apply in determining whether members of Subclass A are employees entitled to reimbursement of business expenses.*

In the moving papers, Corley raised three alternative tests for employment status and argued that class certification was appropriate under any test. As a preliminary matter, although at first Corley preemptively raised the potential applicability of the classification framework set forth in *Martinez v. Combs*, 49 Cal. 4th 35 (2010), at this point it is clear that Corley believes that the *Martinez* framework is inapplicable to this case. (Pl. Supp. Br. 2 (disavowing application of *Martinez*).) Thus, in determining whether Corley meets his burden on class certification, the Court focuses on the other two tests Corley raises, inquiring whether they are the appropriate tests and whether they are amenable to classwide application.

The two remaining tests are set forth in *S.G. Borello & Sons, Inc. v. Dep't of Indus. Rels.*, 48 Cal. 3d 341 (1989) (the "*Borello* test"), and in *Dynamex* (the "ABC Test"), with the latter now codified at California Labor Code section 2775. The two tests and their historical context are as follows:

> For nearly three decades, California courts have used a test based on the decision in [*Borello*] to determine whether workers are correctly classified as employees or independent contractors. The <u>Borello</u> test

considers the "right to control work," as well as many other factors, including (a) whether the worker is engaged in a distinct occupation or business, (b) the amount of supervision required, (c) the skill required, (d) whether the worker supplies the tools required, (e) the length of time for which services are to be performed, (f) the method of payment, (g) whether the work is part of the regular business of the principal, and (h) whether the parties believe they are creating an employer-employee relationship.

In April 2018, the California Supreme Court replaced the <u>Borello</u> test with the "ABC test" for the purpose of determining employment under California wage orders. The court held that under the "suffer or permit to work" language used in all California wage orders, any worker who performs work for a business is presumed to be an employee who falls within the protections afforded by a wage order. However, such a worker can properly be found to be an independent contractor—to whom the wage order would not apply—if the hiring entity establishes:

> (A) that the worker is free from the control and direction of the hirer in connection with the performance of the work, both under the contract for the performance of such work and in fact; (B) that the worker performs work that is outside the usual course of the hiring entity's business; *and* (C) that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed for the hiring entity.

If the putative employer fails to establish any one of the three prongs with regard to a worker, the worker is properly classified as an employee. California's Assembly Bill 5 (AB 5) codified *Dynamex's* holding and adopted the ABC test for all provisions of the California Labor Code, the Unemployment Insurance Code, and IWC wage orders, with numerous exemptions.

*Haitayan v. 7-Eleven, Inc.*, No. CV 17-7454 DSF (ASx), 2021 WL 757024, at *4 (C.D. Cal. Feb. 8, 2021) (citations omitted).

The California Supreme Court's decision in *Dynamex* was a clarification of existing law, and the ABC Test set forth in *Dynamex* applies only in the context of IWC Wage Orders. *James v. Uber Techs. Inc.*, 338 F.R.D. 123, 144 (N.D. Cal. 2021).

Therefore, the ABC Test (or, more accurately, the *Dynamex* version of the ABC Test) applies to all claims arising from California wage orders that were not yet resolved by final judgment as of the date of the *Dynamex* decision. *Id.*; Cal. Lab. Code § 2785. By contrast, for all claims that do not arise from a Wage Order, such as claims brought directly under the California Labor Code, the statutory ABC Test functions only prospectively, from January 1, 2020, forward. *Vazquez v. Jan-Pro Franchising Int'l*, 10 Cal. 5th 944, 958 (2021); *Lawson v. Grubhub, Inc.*, 13 F.4th 908, 912 (9th Cir. 2021); *Haitayan*, 2021 WL 757024, at *5 ("Dynamex applies retroactively, but only to wage orders, and AB 5 is not retroactive.").

Here, as discussed, Corley's reimbursement of business expense claim arises from both Wage Order 9 and the California Labor Code. This suit was filed, and the limitations period on this claim therefore ended, before January 1, 2020, meaning that, to the extent the claim is based on the Labor Code, the *Borello* test applies to determine employment classification. By contrast, because the application of the ABC Test to the definition of employment in wage orders is retroactive, to the extent Corley's claim is based on Wage Order 9, the *Dynamex* version of the ABC Test applies to determine whether the members of Subclass A are employees.

Proceeding from this premise, Subclass A cannot be certified because the *Borello* test cannot be applied to the business expenses claim on a classwide basis, and moreover, even if the ABC Test is capable of classwide application, individualized damages determinations would nevertheless predominate, and Corley's claims are not typical of those of Subclass A.

    2.    *The* Borello *Test is not capable of classwide application across Subclass A.*

Under *Borello*, courts determining whether a given worker is an employee consider primarily the degree of control the putative employer exercises, along with the factors listed above in the extended quote from *Haitayan*. Additional factors provided by the *Borello* court include:

> (1) the alleged employee's opportunity for profit or loss depending on his managerial skill; (2) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; (3) whether the service rendered requires a special skill; (4) the degree of permanence of the working relationship; and (5) whether the service rendered is an integral part of the alleged employer's business.

48 Cal.3d at 355. The California Supreme Court recently confirmed in *Dynamex* that courts applying the *Borello* approach should continue to take all these factors into account, "with deference to the purposes and intended reach of the remedial statute at issue." 4 Cal. 5th at 932.

Here, some of the *Borello* factors invite classwide resolution and others do not. Ultimately, the question is whether the Court can make an accurate, meaningful legal determination one way or another regarding the employment status of all of Subclass A under *Borello*. This, in turn, depends on exactly which *Borello* factors invite classwide resolution, and whether those classwide factors carry enough weight in the analysis so as to allow a uniform determination for all Authorized Officers across all of Subclass A. *See Narayan v. EGL, Inc.*, 285 F.R.D. 473, 478 (N.D. Cal. 2012) ("For purposes of class certification, the issue is whether [the *Borello*] factors may be applied on a classwide basis, generating a classwide answer on the issue of employee status, or whether the determination requires too much individualized analysis."). Making this determination requires some inquiry into the merits of Corley's claim. *See Robinson v. Onstar, LLC*, No. 15-CV-1731 JLS (MSB), 2020 WL 364221, at *8 (S.D. Cal. Jan. 22, 2020) ("The court is 'at liberty to consider evidence which goes to the requirements of Rule 23 even though the evidence may also relate to the underlying merits of the case.'" (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 509 (9th Cir. 1992))).

Factors that lend themselves to classwide resolution in this case include (1) whether linehaul work is customarily done under the direction of a principal or with supervision; (2) the skill required; (3) whether tools were supplied; (4) the

method of payment; (5) whether the work was part of FedEx's regular business; and (6) whether linehaul transportation is an integral part of FedEx's business.  48 Cal.3d at 351, 355.  The key consideration, the right to control the manner and means of accomplishing the work, *id.* at 350, also appears generally capable of classwide resolution.

In this case, the amount of control FedEx exercised over Service Providers militates somewhat in favor of finding no employment requirement.  The record indicates that Service Providers function as their own independent businesses and retain considerable discretion regarding many substantial components of their operations, including the hiring, training, and firing of employees; human resources and accounting; the purchasing of tractors and equipment; fleet maintenance; and contracts with other companies.

Corley argues that the many contractual requirements placed on Service Providers, including behavior expectations for employees, constitute a high level of control.  But the mere existence of legally enforceable contract terms—absent some additional method of enforcement, veto power, or ability to direct the other party—is at most a weak indicator of control.  If it were otherwise, then any independent contract with legally enforceable terms (that is, virtually all independent contracts) would entail too much control and would therefore be improper contracts of employment under *Borello* and its progeny.

Instead, the indicia of control that invalidate the bona fide independent contracting relationship must be based on something more than the ability to enforce contract rights in court.  Here, Corley suggests that the "something more" is FedEx's ability "to disqualify individual drivers from performing FedEx linehaul work on behalf of a TSP."  (Mot. 4; *see id.* at 2 n.2 (suggesting drivers cannot start driving for their Service Provider until approved by FedEx's third party vendor).)  Although the details in the record on this point are somewhat complicated, the upshot appears to be that, for matters not related to the violation of a law or regulation that involves FedEx,

1   each Service Provider retains sole discretion over discipline, hiring, firing,
2   compensation, benefits, scheduling, leave and vacation policies, vehicle purchases,
3   and assignment of drivers to routes or trucks.   This observation is key.   Corley
4   otherwise fails to show that FedEx retained any other substantial right to direct,
5   command, or involve itself in the details of the work of Authorized Officers.   Without
6   the contractual right to terminate the employment of a Service Provider employee who
7   was not following FedEx's instructions or meeting FedEx's expectations or a similar
8   substantial method of implementing or enforcing its expectations, the Court finds that
9   the control consideration militates slightly in favor of finding an allowable
10  independent contracting relationship.

11          Control is the most important factor in the *Borello* analysis.   48 Cal. 3d at 350.
12  This and the other factors that are amenable to classwide resolution, taken together,
13  militate slightly in favor of finding an allowable independent contracting relationship.

14          By contrast, several factors do not lend themselves to classwide resolution.
15  These factors include (1) whether a given Authorized Officer was engaged in a
16  distinct occupation or business, (2) whether an Authorized Officer had opportunity for
17  profit or loss, and (3) and the Authorized Officer's degree of investment in his or her
18  business.   48 Cal.3d at 351, 355. Each of these matters will necessarily vary among
19  Service Providers.   The question is whether these variations are substantial enough to
20  overcome the classwide factors and create individualized differences in the outcome
21  of the employment classification issue.

22          The answer to this question is "yes."   Some Transportation Service Providers
23  consist of a single owner/operator driving a single truck, and some consist of hundreds
24  of employees and a large fleet of tractors.   The latter group of Providers and the
25  former group of Providers are extremely different from one another under the factors
26  set forth in the previous paragraph.   A single-owner/operator Provider ("solo
27  Provider") who does all his or her work for FedEx very strongly *does not* appear to be
28  engaged in a distinct occupation or business, where as a Provider with two hundred

employees who maintains several complex contracts with multiple carriers very strongly *does* appear to be engaged in a distinct occupation or business.  48 Cal.3d at 351.

Similarly, a solo Provider appears to have little opportunity for profit or loss; he or she will make a predetermined amount per line set by FedEx, with any variations in profit or loss tied only to variations in the cost of maintaining the Provider's vehicle.  A large Provider outfit, by contrast, has ample opportunity for profit or loss.  Large operators can create efficiencies at scale by, for example, hiring their own staff to service their trucks rather than outsourcing this task.  Moreover, large operators have a meaningful choice regarding the firms with which they choose to do business and can choose to contract with firms that pay more competitive rates.  This latitude provides large Providers with ample opportunity for profit and loss.  48 Cal.3d at 355.

The same is true of the degree of investment in the business.  *Id.*  Solo Providers might lease their tractors and pay for expenses as they go, representing a minimal investment in the Provider's business.  By contrast, over time, a very large Provider might invest millions of dollars in its fleet and staff.

These considerations are substantial, and they lie at the very heart of the issue of whether individuals serving as Authorized Officers are entitled to have FedEx provide them with the employee protections mandated by the California Labor Code.  *See Dynamex*, 4 Cal. 5th at 932 (affirming *Borello* test requires "deference to the purposes and intended reach of the remedial statute at issue"). The underlying policy concern is ensuring that California's laborers are protected by those employing them—in this instance, by having their employers reimburse business expenses.  *See Cochran*, 228 Cal. App. 4th at 1144.  This concern is extremely salient in the context of small Providers, who might not have access to credit (in case of deficits) or insurance (in case of major loss) or skilled counsel or other professionals who might help them procure these things. Without reimbursement of business expenses, small Providers risk taking in little, no, or negative revenue, and would appear to have little

recourse in the event of a loss.  By contrast, large Providers who take in millions of dollars in annual revenue would be expected to have reserves from which business expenses could be paid.  Moreover, larger Providers have opportunities to create expense-reducing efficiencies, which in turn would free up funds for other irreducible expenses.

The Court cannot say that any of the classwide factors so strongly indicate employment (or not) that they overcome or erase the differences created by these observations.  *Moreno v. JCT Logistics, Inc.*, No. EDCV 17-2489 JGB (KKx), 2019 WL 3858999, at *13 (C.D. Cal. May 29, 2019) (finding that common questions did not predominate in *Borello* analysis where "analysis of whether a class member operated a distinct occupation or business" would "turn on the individual business practices of each [class member's business], such as whether it hired drivers, owned multiple trucks, or simultaneously worked for other businesses" (internal quotation marks removed)).  Moreover, the Court could not solve this problem by simply drawing a line in the sand between Providers above and below a certain number of employees, as these individualized inquiries go beyond the mere size of the Provider and reach the unique factual details about each Provider's business practices.  Thus, were the Court to attempt to draw such a line, many Providers would fall along or close to the line, necessitating individualized determinations for each of them.

After examining "the relationship between the common and individual issues," the Court finds that Subclass A is not "sufficiently cohesive to warrant adjudication by representation."  *Stromberg v. Qualcomm Inc.*, 14 F.4th 1059, 1067 (9th Cir. 2021) (quoting *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 944 (9th Cir. 2009)).  With respect to the business expenses claim, individualized determinations predominate the *Borello* approach to employment classification, and class certification is denied to the extent the business expense claim is founded directly upon the California Labor Code.

3.      *Even if the ABC Test is capable of classwide application across Subclass A, individualized damages determinations predominate.*

Corley's business expenses claim is also raised pursuant to IWC Wage Order 9, meaning that the *Dynamex* version of the ABC Test also applies in determining employment classification for such claims.  However, even if the ABC Test is capable of classwide application across Subclass A[2], Corley fails to demonstrate that the damages arising from the business expenses claim can be addressed in a classwide manner, or in an individualized manner in a way that would not predominate over classwide issues.

Although "[i]ndividual differences in calculating the amount of damages will not defeat class certification where common issues otherwise predominate," *Castillo v. Bank of Am., NA*, 980 F.3d 723, 730 (9th Cir. 2020), Corley more fundamentally fails to show that Authorized Officers are a correct proxy for the individuals that are entitled to business expenses under California law.  It is axiomatic that the party who paid for the business expenses should be the one who receives compensation for those business expenses, as the purpose of California's business expense reimbursement law is to prevent employees from shouldering their employers' business expenses.  *See Cochran*, 228 Cal. App. 4th at 1144.  From this point, the natural assumption is that the Providers' owners were the ones paying the expenses and that they should therefore be reimbursed.  But Corley does not demonstrate that Authorized Officers are the Providers' owners in all cases, and instead appears to concede to FedEx's assertion that Authorized Officers are "usually" the Service Provider's owner.  (Opp'n 3; *see generally* Reply.)  Moreover, some Service Providers had multiple owners,

---

[2] The statutory exemptions to the ABC Test, including the Business-to-Business Exemption raised by the parties, would not appear to apply in this context.  The statutory exemptions were enacted with or after the enacting of AB 5 and the statutory ABC Test, meaning that no statutory exemption applies before January 1, 2020.  Based on this case's limitations periods, this case invokes the *Dynamex* version of the ABC Test, which does not come with any exceptions or exemptions.

meaning that some Authorized Officers were partial owners of their respective Service Providers.

Thus, individualized questions predominate over classwide ones. Even if the Court did find that the members of Subclass A were employees, it would still have to conduct an individualized inquiry about every Authorized Officer to determine (1) whether that Authorized Officer is the owner of the Provider or otherwise the proper person to whom business expenses should be reimbursed and (2) if so, which specific categories of business expenses should be reimbursed to that Authorized Officer. For example, for a very large Service Provider that might be entitled to hundreds of thousands or even millions of dollars in business expense reimbursements, the Court finds it highly implausible that a single Authorized Officer, especially one who is not the sole owner of the Provider, has a right to recover the totality of these reimbursements. This is not, as Corley suggests, a simple matter of looking to FedEx's records; determining which business expenses are reimbursable to an Authorized Officer would require an individualized inquiry into the structure and operation of each Service Provider.[3]

      *4.*    *Corley's claims are not typical of those of Subclass A.*

Moreover, to the extent any Authorized Officers in Subclass A are non-owners or partial owners of their respective Service Providers, the claims of Corley, who fully owned his Service Provider, would not be typical of those of Subclass A. Fed. R. Civ.

---

[3] Corley waffles somewhat between two different points in attempting to convince the Court that business expenses are calculable on a classwide basis. Corley points out that FedEx has records of when it deducted expenses from various Providers' settlements. (Reply 6.) While such expenses might ultimately be reimbursable business expenses, they represent only a small fraction of the totality of business expenses at issue (as the record reflects that Providers purchased fuel or other supplies directly from FedEx only a small portion of the time). These incomplete records would not obviate the need for each Provider to present its own expense records for the Court's review. As each provider is an independent company with its own independent recordkeeping practices, the individualized determination of damages would subsume any classwide efficiencies. Corley otherwise fails to articulate a plausible approach to calculating business expense damages that avoids painstaking individualized proof and calculation.

P. 23(a)(3).  The legal propriety of reimbursement of business expenses to the sole owner of a Service Provider is a fundamentally different question that the propriety of reimbursement of business expenses to an Authorized Officer who is one of many owners of a Provider or not an owner at all.  The arguments Corley will make in support of reimbursement of business expenses to himself as a putative employee will apply only indirectly (or not at all) to differently situated Authorized Officers, such that the Court will not be confident that a determination with respect to Corley and the structure of his particular business should apply to all Authorized Officers in Subclass A.

For all these reasons, Corley's business expenses claim is not appropriate for class certification, and his Motion is **DENIED** to this extent.

## C.  INACCURATE WAGE STATEMENTS

The third claim Corley presents for certification is his claim for inaccurate wage statements.  This claim is brought on behalf of the entire class of individuals who performed work pursuant to a Linehaul Transportation Agreement, which includes both Authorized Officers and any worker directly employed by a Service Provider.

Corley's wage statement claim may be brought under Wage Order 9, section 7, or directly pursuant to the California Labor Code.[4]  California Labor Code section 226(a) requires employers to furnish employees with a wage statement, typically semimonthly, containing several enumerated items of information, including the applicable hourly rates and the number of hours worked.  Noncomplying employers are subject to penalties calculated based on the number of employees and the number of noncompliant pay periods.  Cal. Lab. Code § 226(e)(1).  Similarly, Wage Order 9, section 7(B) requires employers to furnish a semimonthly itemized wage statement.  Cal. Code Regs. Tit. 8, § 11090.

---

[4] The FAC does not make clear that Corley's wage statement claim is also brought pursuant to Wage Order 9.  If it is not, then the *Borello* test applies to the entire claim and is unworkable for the reasons discussed in the previous section.  The Court assumes for the purpose of analysis that the wage statement claim is also brought under Wage Order 9 and nevertheless reaches the same result.

To the extent Corley's wage statement claim is brought under the Labor Code, the *Borello* test applies and raises fatal concerns regarding predominance, as discussed previously.

To the extent either party argues the ABC Test (that is, the version of the ABC Test as held and applied in *Dynamex*) applies to classify any or all members of the class, this argument is not well taken.  Corley emphasizes throughout his moving papers that he is not bringing this action under a joint employer theory, but the application of the *Dynamex* version of the ABC Test is not dependent upon the mere decision to frame one's allegations in terms of a joint employer theory.  Instead, under *Salazar v. McDonald's Corp.*, 944 F.3d 1024 (9th Cir. 2019), the *Dynamex* version of the ABC Test does not apply when the plaintiff is already directly employed by another entity, because in such situations, no party is arguing that the plaintiffs are independent contractors.  *Id.* at 1032.  Thus, *Salazar* directs courts to construe *Dynamex* rather narrowly by applying it only to cases where a worker was initially expressly classified and treated by the defendant as an independent contractor.  That is not the case here; the record as presented by both sides generally indicates that those who worked for Transportation Service Providers did so as employees of the Provider.  Moreover, nothing in the record suggests that either party ever classified any employees of a Transportation Service Provider as independent contractors of FedEx.  Accordingly, under *Salazar*, and for the purpose of the wage statement claim, the *Dynamex* version of the ABC Test is inapplicable to all those who were employees of a Service Provider.[5]

This leaves the *Borello* test as employment classification test to be applied to class members who were employees of a Service Provider, which appears to constitute the strong majority of the class.  But, for all the same reasons discussed in the context

---

[5] This analysis does not necessarily apply to the business expenses claim, as the record does not indicate that most or all members of Subclass A (that is, all Authorized Officers) were employees of their respective Service Providers.

of the business expenses claim, the *Borello* framework presents insurmountable concerns regarding class action predominance.   For these reasons, Corley's wage statement claim is not certifiable, and the Court **DENIES** the Motion to this extent.

**D.**   **UNFAIR BUSINESS PRACTICES (UCL)**

The final claim Corley presents for certification is for unfair business practices pursuant to California's unfair competition law, California Business and Professions Code section 17200.  Corley asserts that this claim is "wholly derivative."  (Mot. 23.) That being the case, certification of this claim is inappropriate for the reasons stated above.  The Court **DENIES** the Motion with respect to Corley's UCL claim.

**V.   CONCLUSION**

For the foregoing reasons, Plaintiff Kawaski Corley's Motion to Certify Class is **DENIED WITH PREJUDICE**.  (ECF No. 69.)

**IT IS SO ORDERED.**

June 2, 2022

_____

_____

**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**